# IN THE SUPREME COURT OF CALIFORNIA

LISA NIEDERMEIER,

Plaintiff and Respondent,

v.

FCA US LLC,

Defendant and Appellant.

S266034

Second Appellate District, Division One
B293960

Los Angeles County Superior Court
BC638010

March 4, 2024

Justice Evans authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, and Jenkins concurred.

Justice Kruger filed a concurring opinion, in which Justices Groban and Jenkins concurred.

NIEDERMEIER v. FCA US LLC

S266034

Opinion of the Court by Evans, J.

California's lemon law protects consumers who purchase defective vehicles or other goods. The lemon law, officially known as the Song-Beverly Consumer Warranty Act (Civ. Code, § 1791 et seq.;[1] hereafter the Act or the Song-Beverly Act), permits new vehicle buyers who have been damaged by a manufacturer's failure to comply with the Act to sue under section 1794 for the recovery of damages and other relief. (§ 1794, subd. (a).) The measure of a buyer's damages in such an action includes "replacement or reimbursement as set forth in subdivision (d) of Section 1793.2 . . . ." (*Id.*, subd. (b).) If a manufacturer is unable to repair a new vehicle after a reasonable number of attempts, section 1793.2, subdivision (d) requires the manufacturer to promptly replace the vehicle or promptly pay restitution "in an amount equal to the actual price paid or payable by the buyer," as specified. (*Id.*, subd. (d)(2)(B).) The manufacturer is entitled to reduce the amount of restitution by the "amount directly attributable" to the buyer's use of the vehicle prior to the time the buyer first delivered the vehicle for repair. (*Id.*, subd. (d)(1); see also *id.*, subd. (d)(2)(C).)

The questions before us are whether, in an action under section 1794, the statutorily-defined measure of restitution set forth in section 1793.2, subdivision (d)(2) (hereafter sometimes

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

referred to as the statutory restitution remedy) must be reduced by proceeds a buyer has received when trading in or selling a defective vehicle and, if so, whether the reduction should be assessed before or after penalties are calculated.[2]  The Court of Appeal below held that the statutory restitution remedy did not include the amount a plaintiff recovered after trading in a defective vehicle, and thus reduced the plaintiff's damages award by the trade-in amount (here, $19,000).  (*Niedermeier v. FCA US LLC* (2020) 56 Cal.App.5th 1052, 1060, 1061 (*Niedermeier*).)

We conclude that in an action pursuant to section 1794, neither a trade-in credit nor sale proceeds reduce the statutory restitution remedy set forth in section 1793.2, subdivision (d)(2) at least where, as here, a consumer has been forced to trade in or sell a defective vehicle due to the manufacturer's failure to comply with the Act.  Given this conclusion, we do not reach the issue of when such a reduction, if it were authorized, should be assessed.  Accordingly, we reverse the judgment of the Court of Appeal.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In January 2011, Lisa Niedermeier purchased a new Jeep Wrangler (hereafter the vehicle) from FCA US LLC (hereafter FCA) for approximately $40,000.  Almost immediately, and

---

[2]     As Niedermeier had traded in her vehicle, the issue before the Court of Appeal was limited to whether the restitution remedy included the amount Niedermeier recovered by trading in the vehicle.  FCA US LLC, however, assumes the same analysis applies to proceeds from the sale of a defective vehicle, and we find that the outcome would remain the same regardless of whether a buyer trades in or sells a defective vehicle.  Our analysis therefore encompasses both circumstances throughout.

throughout the warranty period, Niedermeier experienced a variety of problems with the vehicle's transmission, engine, and exhaust. These problems caused the vehicle to jerk, make rattling and grinding noises, and emit noxious gases. They caused the floorboard of the vehicle to heat up and impaired the vehicle's braking, acceleration, and turning. Niedermeier presented the vehicle to FCA's authorized repair facilities a total of 16 times over four years, but the facilities were unable to remedy the defects. Niedermeier's vehicle was out of commission for 75 days during the failed repair attempts.

In April 2015, Niedermeier asked FCA to buy back the vehicle, but FCA declined. Niedermeier renewed her request in early June 2015, and made a third buyback demand in late June 2015. FCA, however, declined to repurchase the vehicle. By the time Niedermeier made the third buyback request, she had presented the vehicle for repair 14 times. In October 2015, after additional repair attempts failed, Niedermeier traded in the vehicle for a new GMC Yukon. The purchase price of the Yukon was $80,000, and the dealership gave Niedermeier a $19,000 trade-in credit towards that purchase.

In October 2016, Niedermeier filed a lawsuit against FCA asserting causes of action for breach of express warranty under the Act, breach of implied warranty under the Act, fraudulent inducement and concealment, and negligent repair. A jury found in Niedermeier's favor on her claims for breach of express warranty and breach of implied warranty and awarded her $98,961.08. The jury found against Niedermeier on her claim for fraudulent inducement/concealment. The jury also found that FCA willfully violated the Act. The damages award included: the purchase price of the vehicle, including charges for transportation and manufacturer-installed options, finance

charges, sales tax, license fees, and other official fees pursuant to section 1793.2, subdivision (d)(2)(B), a total of $39,799; incidental and consequential damages of $5,000; and a deduction of $5,214.57, reflecting the amount attributable to Niedermeier's use of the vehicle before she first delivered it to FCA's authorized facilities for repairs pursuant to section 1793.2, subdivision (d)(2)(C). The award also included a penalty of $59,376.65 pursuant to section 1794, subdivision (c) due to FCA's willful failure to repurchase the vehicle.

Following the verdict, FCA filed a postjudgment motion requesting a $19,000 offset from the awarded damages (the amount of the trade-in credit Niedermeier received on the Yukon's purchase price), to be imposed before the civil penalty was assessed. This would have resulted in a total award of $51,461.07. The trial court denied FCA's motion. It reasoned that reducing the jury's award by the trade-in amount would be inconsistent with the pro-consumer policy supporting the Act. The court concluded an offset for the trade-in "would reward defendant for its delay in replacing the car or refunding plaintiff's money when defendant had complete control over the length of that delay, and an affirmative statutory duty to replace or refund promptly. . . . 'No one can take advantage of his own wrong.' (§ 3517.) Nor can principles of equity be used to avoid a statutory mandate."

FCA appealed. It made three arguments before the Court of Appeal: (1) by obtaining a full refund under section 1793.2, subdivision (d)(2) in addition to proceeds from the trade-in of the vehicle, Niedermeier received a windfall, which is inconsistent with the concept of restitution; (2) provisions of the California Uniform Commercial Code incorporated into section 1794 of the Act recognize that a buyer's recovery is reduced by the amount

4

the buyer obtains by reselling the vehicle; and (3) allowing Niedermeier a full refund on top of trade-in proceeds she received would undermine legislative protections for downstream consumers in the used car market by effectively nullifying the Act's requirement that manufacturers notify subsequent purchasers of defects in reacquired vehicles.

The Court of Appeal agreed with FCA's first and third arguments and reversed. It declined to consider FCA's second argument. The Court of Appeal held, as a matter of first impression, that the Act's restitution remedy — "set at 'an amount equal to the actual price paid or payable' for the vehicle" — does not include any amount a plaintiff receives from trading in the defective vehicle. (*Niedermeier*, *supra*, 56 Cal.App.5th at p. 1061.) The Court of Appeal reasoned that the Legislature's use of the word "restitution" in section 1793.2, subdivision (d)(2)(B) indicates an intent to restore the status quo ante as far as practicable and return buyers to the financial position they would have been in had they not purchased the vehicle. (*Niedermeier*, at p. 1071.) It concluded that allowing Niedermeier the full restitution remedy after she received a credit for trading in the vehicle would place her in a better position than if she had never purchased the vehicle, a result inimical to the concept of restitution. (*Ibid.*)

The Court of Appeal also opined that allowing the full restitution refund under section 1793.2, subdivision (d)(2)(B) would thwart the lemon law's labeling and notification requirements. It noted that the labeling and notification provisions are only triggered when a manufacturer reacquires the defective vehicle. It reasoned that allowing buyers to recover the full restitution remedy after receiving trade-in proceeds would incentivize buyers to reintroduce defective

vehicles into the market without the statutorily required Lemon notifications, rendering the labeling and notification provisions "largely meaningless, a result contrary to the rules of statutory construction." (*Niedermeier, supra*, 56 Cal.App.5th at p. 1072.)

We granted review. Since that time, another division of the Second Appellate District has disagreed with *Niedermeier* and held that a manufacturer is not entitled to a reduction in restitution damages under section 1793.2, subdivision (d)(2) for the net cash a plaintiff receives after selling a defective vehicle to a third party. (*Figueroa v. FCA US, LLC* (2022) 84 Cal.App.5th 708, 713–714 (*Figueroa*).) We granted review in *Figueroa* on February 1, 2023, and deferred further action in that matter until after this case is decided.

More recently, the Third Appellate District also disagreed with *Niedermeier*. It agreed with *Figueroa* that a buyer's restitution under the Act does not exclude the credit a buyer receives when trading in a defective vehicle. (*Williams v. FCA US LLC* (2023) 88 Cal.App.5th 765, 772 (*Williams*).) The court concluded that the jury impermissibly deducted the buyer's $29,500 trade-in credit when calculating the actual price paid or payable as provided in the statutory restitution remedy. (*Id.* at p. 786.) We granted review in *Williams* on May 3, 2023, and deferred further action in that matter until after this case is decided.

## II. DISCUSSION

We are first asked to determine whether a consumer's restitution damages award, defined in section 1793.2, subdivision (d)(2), must be reduced by the proceeds the consumer receives after trading in or selling a defective vehicle. This is a question of statutory construction, which we review de

novo.  (*Apple, Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.)
As with all cases of statutory interpretation, "[w]e first examine
the statutory language, giving it a plain and commonsense
meaning.  [Citation.]  We do not consider statutory language in
isolation; instead, we examine the entire statute to construe the
words in context.  [Citation.]  If the language is unambiguous,
'then the Legislature is presumed to have meant what it said,
and the plain meaning of the language governs.' "  (*Kirzhner
v. Mercedes–Benz USA, LLC* (2020) 9 Cal.5th 966, 972
(*Kirzhner*).)  Further, "there is no need for construction, nor is it
necessary to resort to indicia of the intent of the Legislature" to
interpret the statute.  (*Lungren v. Deukmejian* (1988) 45 Cal.3d
727, 735.)

On the other hand, " '[i]f the statutory language permits
more than one reasonable interpretation, courts may consider
other aids, such as the statute's purpose, legislative history, and
public policy.' "  (*Kirzhner, supra,* 9 Cal.5th at p. 972.)  When
more than one statutory construction is arguably possible, our
policy is " 'to favor the construction that leads to the more
reasonable result.' [Citation.]  This policy derives largely from
the presumption that the Legislature intends reasonable results
consistent with the apparent purpose of the legislation.
[Citation.]  Thus, our task is to select the construction that
comports most closely with the Legislature's apparent intent,
with a view to promoting rather than defeating the statutes'
general purpose, and to avoid a construction that would lead to
unreasonable, impractical, or arbitrary results."  (*Imperial
Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 388.) We
also keep in mind that the Act is " 'manifestly a remedial
measure, intended for the protection of the consumer; it should
be given a construction calculated to bring its benefits into

action.'" (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 (*Murillo*); see also *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313 ["civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose"]; see *Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 530 (*Pineda*) [liberally construing § 1747.08 of the Song-Beverly Credit Card Act].)

### A. The Plain Text of Section 1794 and the Statutory Restitution Remedy Do Not Support an Offset for a Trade-in Credit or Sale Proceeds

Resolution of the first issue before us requires us to interpret several interrelated provisions of the Act. First, section 1794, subdivision (a) permits a buyer who "is damaged by a failure to comply with any obligation" under the Act or under an implied or express warranty or service contract to "bring an action for the recovery of damages and other legal and equitable relief." (§ 1794, subd. (a).) "The measure of the buyer's damages in an action under this section shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2, and the following: [¶] (1) Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale, Sections 2711, 2712, and 2713 of the Commercial Code shall apply. [¶] (2) Where the buyer has accepted the goods, Sections 2714 and 2715 of the Commercial Code shall apply, and the measure of damages shall include the cost of repairs necessary to make the goods conform." (*Id.*, subd. (b).)

In turn, section 1793.2, subdivision (d)(2) of the Act provides that if a manufacturer or its representative "is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle in accordance with subparagraph (A) or promptly make restitution to the buyer in accordance with subparagraph (B). However, the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle."[3]

The Act provides a specific formula for calculating the amount of restitution. According to the Act, "the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, but

---

[3]     Section 1793.2, subdivision (d)(2) has dual purposes. First, it (along with the other subdivisions of § 1793.2) instructs manufacturers about what they must do to *comply* with the Act when a vehicle proves defective. (See generally *Kirzhner*, *supra*, 9 Cal.5th at p. 971 [§ 1793.2, subd. (d)(2) "sets forth the manufacturer's affirmative obligation to 'promptly' repurchase or replace a defective vehicle it is unable to repair" and describes how manufacturers must offer replacement or restitution in order to comply with the Act].) Second, section 1793.2, subdivision (d)(2) includes the right to reimbursement as a measure of damages in an action pursuant to section 1794. (See *Kirzhner*, at pp. 971–972 [§ 1794 is "the Act's general damages provision" and permits buyers to seek damages, "the measure of which includes the restitution and replacement remedies"].) The question before us today involves the latter purpose of section 1793.2, subdivision (d)(2), and our analysis is therefore limited to the issue of the calculation of damages in a lawsuit under section 1794.

excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales or use tax, license fees, registration fees, and other official fees, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer." (§ 1793.2, subd. (d)(2)(B).)  The amount to be paid to the buyer may also "be reduced by the manufacturer by that amount directly attributable to use by the buyer prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity." (§ 1793.2, subd. (d)(2)(C).)  Offsets for nonmanufacturer items installed by a dealer or buyer and the buyer's predelivery use of the vehicle are the only reductions to the restitution remedy enumerated in section 1793.2, subdivision (d).

### 1. *The Statutory Restitution Remedy Does Not Allow a Restitution Award to Be Reduced by a Trade-in Credit or Sale Proceeds*

The parties disagree how the restitution remedy in section 1793.2, subdivision (d)(2) should be interpreted.  The parties specifically disagree whether the amount Niedermeier received when she traded in the defective vehicle should be excluded from the statutory restitution remedy.  Niedermeier argues the Act's plain language lays out the precise measure and scope of restitution and does not permit any reduction in the restitution award by the amount of a trade-in credit.  Notwithstanding the Act's defined restitution formula, including its express reference to specific permissible offsets, FCA argues that restitution should be given the same meaning as provided in common law.  According to FCA, Niedermeier's

restitution award should be reduced by the amount she recovered when trading in the vehicle in order to avoid a double recovery.

We agree with Niedermeier and conclude the plain language of the Act does not support FCA's construction of section 1793.2. As noted above, the Act's plain language lays out a specific formula for calculating the amount of restitution to be paid by the manufacturer as damages in an action pursuant to section 1794. The statutory restitution remedy has clearly enumerated exceptions, none of which includes the offset requested by FCA. (Accord, *Figueroa, supra*, 84 Cal.App.5th at p. 712 ["[t]he statute is clear and unequivocal"]; *Williams, supra,* 88 Cal.App.5th at p. 780 ["[a]lthough the Legislature used the word 'restitution' in section 1793.2, subdivision (d), it clearly defined *that term* in the restitution provision by stating it is 'an amount equal to the actual price paid or payable by the buyer,' a calculus that includes and excludes specified costs" (original italics)].)

Nowhere does section 1793.2 provide that a restitution award must be reduced by any amount a buyer receives when trading in or selling the defective vehicle to a third party. In order to adopt FCA's statutory construction, we would have to ignore the words following "restitution" in section 1793.2, subdivision (d)(2)(B), including "paid or payable" and the enumerated exceptions. "[O]ur office is simply to ascertain and declare what the statute contains, not to change its scope by reading into it language it does not contain or by reading out of it language it does. We may not rewrite the statute to conform to an assumed intention that does not appear in its language." (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253; see also *Jiagbogu v. Mercedes–Benz USA* (2004) 118 Cal.App.4th

1235, 1241 (*Jiagbogu*) ["We may not rewrite the section to conform to that unexpressed, supposed intent"]; see also *Figueroa, supra,* 84 Cal.App.5th at p. 712 ["We cannot add words to a clear and unequivocal statute"].)

As noted above, the statute excludes nonmanufacturer-installed options from the restitution calculation (§ 1793.2, subd. (d)(2)(B)) and permits the restitution award to be reduced by the amount of a buyer's predelivery use of the vehicle (*id.,* subd. (d)(2)(C)). The choice to include these exceptions, and no others, indicates that the Legislature intended to specify how restitution awards for new motor vehicles must be calculated, including limiting the number and type of offsets to those explicitly enumerated.[4] The Legislature recognized there were multiple sources of potential offsets to the restitution remedy yet did not include trade-in credits or sales proceeds in the statute. The Legislature could have stated that trade-in or sale amounts were to be offset or reduced from the statutory restitution remedy. It did not do so. "We will not create an

---

[4] Indeed, in section 1793.2, subdivision (d), the measure of restitution is defined differently for "goods" and "new motor vehicles." For "goods," restitution is defined as, "the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity." (§ 1793.2, subd. (d)(1).) We have thus held that section 1793.2, subdivision (d) "treats the special provisions applicable to new motor vehicles in subdivision (d)(2) as an exception to the general provision applicable to all consumer goods in subdivision (d)(1)[,]" as subdivision (d)(2) "provides *additional specifications* for both the refund and restitution remedies." (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 490–491, italics added; see also *id.* at p. 491 ["If restitution is selected, the amount is to be calculated as specified by the statute"].)

exception the Legislature did not enact." (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 636.)

Moreover, trade-in or sale proceeds obtained years after the purchase of a defective vehicle are not part of "the actual price paid or payable" because they are separate and apart from the settled purchase price of the vehicle at the time of contracting. In our recent opinion in *Kirzhner*, we explained that the "actual price paid or payable" is determined at the time of the vehicle's purchase. (*Kirzhner*, *supra*, 9 Cal.5th at pp. 974–975.) In *Kirzhner*, we were tasked with determining whether vehicle registration renewal and nonoperation fees plaintiff paid after initially leasing his vehicle were recoverable as collateral charges or as incidental damages under section 1793.2, subdivision (d)(2)(B). We held that the charges were not recoverable as collateral charges because they "are not auxiliary to and do not supplement the price paid [for the vehicle] because they are not paid as part of the total cost of the vehicle and in exchange for the vehicle." (*Kirzhner*, *supra*, 9 Cal.5th at p. 975.)

We rejected Kirzhner's argument that the phrase "actual price paid or payable" indicated a legislative intent to ensure the manufacturer paid the consumer what the consumer actually paid *as of the time of the repurchase* rather than at the time of contracting. We explained, "[t]he word 'price' means '[t]he cost at which something is obtained' or '[t]he consideration given for the purchase of a thing.'" (*Kirzhner*, *supra*, 9 Cal.5th at pp. 972–973, citing Black's Law Dict. (6th ed. 1990) p. 1188, col. 2); see also Black's Law Dict. (11th ed. 2019) [price means "[t]he amount of money or other consideration asked for or given in exchange for something else; the cost at which something is bought or sold"].) We noted the word "'payable'" in

13

section 1793.2, subdivision (d)(2)(B) modifies the word " 'price' " and simply acknowledges that some buyers do not pay the full cost of the vehicle at the time of the initial purchase or lease, but does not demonstrate that all later-incurred charges or expenses connected to ownership or use of vehicle are recoverable. (*Kirzhner*, at p. 974.) We concluded, however, that the charges would be recoverable as incidental damages if they were incurred as a result of the manufacturer's failure to promptly provide a replacement vehicle or restitution under section 1793.2, subdivision (d)(2). (*Kirzhner*, at p. 977.)

The Court of Appeal here acknowledged section 1793.2, subdivision (d)(2)(B) defines restitution as "the actual price paid or payable," but declined to follow a plain language reading of the statute. Relying on *Mitchell v. Blue Bird Body Co.* (2000) 80 Cal.App.4th 32 (*Mitchell*), it found the Legislature's choice of the word "restitution" significant in this case and reasoned that a literal interpretation of the statute would disregard the Legislature's word choice, allow Niedermeier "to recover far more from [FCA] than her actual economic loss[,]" and result in an unjustified windfall to Niedermeier. (*Niedermeier, supra,* 56 Cal.App.5th at p. 1071.)

We find the Court of Appeal's reliance on *Mitchell* to be misplaced. In *Mitchell*, the court considered whether the "actual price paid or payable" in section 1793.2, subdivision (d)(2)(B) included interest payments paid after a vehicle was purchased. It held the payments were part of the actual price paid or payable, and properly recoverable as restitution under the Act, because consumers become legally obligated to pay the payments at the time the vehicle is purchased or leased. (*Mitchell, supra,* 80 Cal.App.4th at p. 38.) It is true that the *Mitchell* court interpreted "restitution" as designating a remedy

meant "to restore 'the status quo ante as far as is practicable . . . .'" (*Id.* at p. 36, italics omitted.) But *Mitchell* did not consider whether it was appropriate to *reduce* the statutory restitution remedy by the amount of a trade-in credit or sale proceeds in order to restore the status quo. Contrary to the Court of Appeal's conclusion, *Mitchell*'s analysis suggests that reducing the restitution remedy by an amount not enumerated in section 1793.2, subdivision (d) would be inappropriate. The *Mitchell* court emphasized the remedial nature of the Act and explained that restoring the status quo was intended to afford " 'complete relief, including restitution of benefits . . . and any consequential damages to which [the purchaser] is entitled . . . .'" (*Mitchell*, *supra*, 80 Cal.App.4th at p. 36.) It thus concluded that "the Legislature intended to allow a buyer to recover the entire amount actually expended for a new motor vehicle, including paid finance charges, *less any of the expenses expressly excluded by the statute*." (*Id.* at p. 37, italics added.)

In interpreting "restitution," the *Mitchell* court relied on *Alder v. Drudis* (1947) 30 Cal.2d 372, 384, in which we observed, "The purpose of restitution as a remedy for breach is the restoration of the status quo ante as far as is practicable, and in the absence of qualifying circumstances, the plaintiff must return any consideration he has received in order to obtain specific restitution." (Italics omitted.) *Alder*, however, predates the Act's enactment by more than 20 years, did not concern breach of a product warranty, and considers only common law restitution and rules of equity. The plain language of section 1793.2, subdivision (d)(2), by contrast, indicates that the Legislature intended "restitution" to be "a term of art separate

from the evolving common law concept that shares the name."[5] (*Scholes v. Lambirth Trucking Co.* (2020) 8 Cal.5th 1094, 1111; see also *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 500 [courts generally apply common law when a statute refers to a term without defining the term]; *People v. Lopez* (2003) 31 Cal.4th 1051, 1060 ["if a term known to the common law *has not otherwise been defined by statute*, it is assumed that the common law meaning was intended" (italics added)]; *Williams*, *supra*, 88 Cal.App.5th at p. 780 [same].) Moreover, " 'principles of equity [cannot] be used to avoid a statutory mandate.' " (*Martinez v. Kia Motors America, Inc.* (2011) 193 Cal.App.4th 187, 199 (*Martinez*), citing *Jiagbogu*,

---

**5**      Notably, the statutory restitution remedy is consistently referenced throughout the Act by specific reference to section 1793.2, subdivision (d)(2) and its directive for calculating restitution. (See, e.g., §§ 1793.23, subd. (c) [labeling requirements include circumstances in which "the manufacturer knew or should have known that the vehicle is required by law to be replaced [or] accepted for restitution due to the failure of the manufacturer to conform the vehicle to applicable warranties pursuant to paragraph (2) of subdivision (d) of Section 1793.2"], 1793.25, subd. (a) ["State Board of Equalization shall reimburse the manufacturer of a new motor vehicle for an amount equal to the sales tax or use tax which the manufacturer . . . includes in making restitution to the buyer or lessee pursuant to subparagraph (B) of paragraph (2) of subdivision (d) of Section 1793.2"], 1794, subd. (b) ["The measure of the buyer's damages in an action under this section shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2"].) These repeated references to subdivision (d)(2) further indicate a legislative intent to attribute a specific statutory restitution formula to the term "restitution" distinct from the common law definition.

*supra,* 118 Cal.App.4th at p. 1244.) The plain language of section 1793.2, subdivision (d)(2) does not contemplate an unenumerated reduction to the statutory restitution remedy for a trade-in credit or sale proceeds received after the purchase of a defective vehicle.

>   2. *Section 1794's Reference to the California Uniform Commercial Code Does Not Provide a Basis to Reduce Restitution Damages by a Trade-in Credit or Sale Proceeds*

FCA next contends that Niedermeier's damages must be reduced by the amount she received when she traded in the defective vehicle since section 1794, subdivision (b) incorporates California Uniform Commercial Code sections 2711 through 2715. These provisions prohibit a double recovery and set forth a reduced measure of damages when a buyer resells goods. FCA argues that because section 1794, subdivision (b) states that the measure of damages "shall include the rights of replacement or reimbursement . . . *and*" (italics added) the California Uniform Commercial Code remedies, the remedies identified in section 1793.2, subdivision (d) and the remedies identified in the California Uniform Commercial Code are not merely alternate measures of damages. Rather, FCA urges, the measure of damages must consider both the statutory restitution remedy and the relevant provisions of the California Uniform Commercial Code. Citing *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174 (*Kwan*), *Bishop v. Hyundai Motor America* (1996) 44 Cal.App.4th 750 (*Bishop*), and *Kirzhner,* FCA argues the Legislature has made it clear that damages — including the restitution remedy — are measured in the same manner as, and subject to the general rules applicable to, ordinary contracts.

We conclude that the Act's restitution and replacement remedies are distinct from the available California Uniform Commercial Code remedies referenced in section 1794, and the California Uniform Commercial Code remedies do not reduce the Act's statutory restitution remedy. We also find that any attempt to reduce the statutory restitution remedy by the remedies set forth in the California Uniform Commercial Code would conflict with the Act, and the Act's restitution remedy thus controls. (See § 1790.3.)

"[A]s the *conjunctive language* in Civil Code section 1794 indicates, the statute itself provides an additional measure of damages beyond replacement or reimbursement (Civ. Code, § 1793.2, subd. (d)) and permits, *at the option of the buyer*, the Commercial Code measure of damages which includes 'the cost of repairs necessary to make the goods conform.' (Civ. Code, § 1794, subd. (b)(2).)" (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 302 (*Krotin*), italics added.) Moreover, the plain language of section 1794 makes clear that "[t]he measure of the buyer's damages in an action under this section shall include the rights of replacement or reimbursement *as set forth* in subdivision (d) of Section 1793.2, and [the California Uniform Commercial Code remedies]." (§ 1794, subd. (b), italics added.) The phrase "as set forth" indicates that the buyer is entitled to the statutory restitution remedy as distinctly and precisely described in section 1793.2, subdivision (d) in addition to any applicable remedies set forth in the California Uniform Commercial Code.

FCA's statutory interpretation not only disregards the plain language of section 1794, it also ignores the overall statutory context. Section 1794 is intended to encompass all of the remedies available for failures to "comply with any

obligation under this chapter [i.e., the Act,]" as well as non-Act failures to comply with any obligation "under an implied or express warranty or service contract . . . ." (§ 1794, subd. (a); § 1790; see also *Kwan, supra,* 23 Cal.App.4th at p. 180 ["Section 1794 sets out the damages available to a buyer for a seller or manufacturer's failure to comply with an obligation under the Act or under a consumer product warranty"].) Moreover, the Act provides that its remedies "are *cumulative* and shall not be construed as restricting any remedy that is otherwise available . . . ." (§ 1790.4, italics added.) We have similarly observed that the "pro-consumer remedies [of the Act] are *in addition to* those available to a consumer pursuant to the Commercial Code ( . . . § 1790.3) and the Unfair Practices Act ( . . . § 1790.4)." (*Murillo, supra,* 17 Cal.4th at p. 990, italics added.)

The language of the statutory restitution remedy itself further supports our conclusion that it is distinct from the California Uniform Commercial Code remedies identified in section 1794. Section 1793.2, subdivision (d)(2)(B) requires the manufacturer to "make restitution in an amount equal to the actual price paid or payable by the buyer . . . *plus* any incidental damages to which the buyer is entitled under Section 1794." (Italics added.) The inclusion of the word "plus" indicates that a buyer may receive damages available in the California Uniform Commercial Code in *addition* to the statutory restitution amount recoverable under section 1793.2, subdivision (d)(2). As the Court of Appeal explained in *Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 213, the Act "supplements, rather than supersedes, the provisions of the California Uniform Commercial Code." (See also § 1790.3;

§ 1794, subd. (b) [incorporating specific damages provisions of the Cal. U. Com. Code].)

The California Uniform Commercial Code remedies referenced in section 1794 stand separate and apart from the remedies in section 1793.2, subdivision (d), and do not purport to limit the statutory restitution remedy in any way. This makes sense because the Act provides more extensive consumer protections than the California Uniform Commercial Code. (*Krotin*, *supra*, 38 Cal.App.4th at p. 301; see also *Murillo*, *supra*, 17 Cal.4th at p. 989 [the Act " 'regulates warranty terms, imposes service and repair obligations on manufacturers, distributors, and retailers who make express warranties, requires disclosure of specified information in express warranties, and broadens a buyer's remedies to include costs, attorney's fees, and civil penalties.' "].) FCA cites no authority in which the Act's statutory restitution remedy has ever been reduced by the provisions of the California Uniform Commercial Code referenced in section 1794, and its proposed reading would elevate the California Uniform Commercial Code over the remedies provided in the Act and be contrary to the Act itself. "The provisions of [the Act] shall not affect the rights and obligations of parties determined by reference to the Commercial Code except that, where the provisions of the Commercial Code conflict with the rights guaranteed to buyers of consumer goods under the provisions of [the Act], the provisions of [the Act] shall prevail." (§ 1790.3.)

FCA's reliance on *Kwan*, *Bishop*, and *Kirzhner* is misplaced. These cases address whether certain damages *not explicitly enumerated in the Act* were recoverable under it. (*Kwan*, *supra*, 23 Cal.App.4th at p. 192 [emotional distress damages not recoverable for violations of the Act]; *Bishop*,

*supra*, 44 Cal.App.4th at pp. 757–758 [emotional distress and loss of use damages for time period plaintiff had no replacement vehicle after defective vehicle was destroyed not recoverable under Act]; *Kirzhner, supra,* 9 Cal.5th at p. 981 [registration renewal and nonoperation fees incurred after purchase of vehicle not recoverable under the Act as collateral charges, but may be recoverable as incidental damages].) For various reasons, these cases found it appropriate to turn to the California Uniform Commercial Code provisions referenced in section 1794 in order to determine whether such damages were recoverable. But none of these cases holds the restitution remedy may be reduced by reference to those California Uniform Commercial Code provisions. (See *Kwan, supra,* 23 Cal.App.4th at p. 187 ["Under section 1794, subdivision (b), the buyer's remedies under the Act include, *in addition to* the refund-or-replace remedy of section 1793.2, subdivision (d), [California Uniform Commercial Code] damages as" stated in subsections (1) and (2) (italics added)]; *Bishop, supra,* 44 Cal.App.4th at p. 754 [in case of restitution, buyer is also entitled to, inter alia, incidental damages and civil penalty]; *Kirzhner, supra,* 9 Cal.5th at pp. 971–972 [measure of damages includes restitution and replacement remedies as well as remedies allowed by the Cal. U. Com. Code].)

FCA argues a few out-of-state cases support a conclusion that the relevant provisions of the California Uniform Commercial Code should reduce the statutory restitution remedy.[6] None of these cases, however, address the issue before

---

[6]    See *Gast v. Rogers-Dingus Chevrolet* (Miss. 1991) 585 So.2d 725; *Roneker v. Kentworth Truck Co.* (W.D.N.Y. 1997)

us: whether alternate California Uniform Commercial Code remedies should reduce damages calculated pursuant to the express statutory restitution formula contained in California's lemon law. The cases cited by FCA merely found that damages for certain breaches of warranty were to be determined under the relevant state equivalents of the model Uniform Commercial Code. In California, as discussed above, the Uniform Commercial Code provides additional damages affected consumers can elect to pursue under section 1794 if they wish but it does not displace the statutory restitution remedy. (See *Krotin*, *supra*, 38 Cal.App.4th at p. 302.)

In sum, we hold that "restitution" has the meaning provided in section 1793.2, subdivision (d)(2)(B) and reducing a damages award by the amount of a trade-in credit or sale is not permitted by that statute or by section 1794's incorporation of California Uniform Commercial Code remedies. FCA's reading of sections 1794 and 1793.2, subdivision (d)(2) would force us to "ignore the actual words of the statute in an attempt to vindicate our perception of the Legislature's purpose in enacting the law[,]" which is something we cannot do. (*Murillo*, *supra*, 17 Cal.4th at p. 993.)

## B. Offsets for a Trade-in Credit or Sale Proceeds Are Not Consistent with the Legislative History of Sections 1794 and 1793.2, Subdivision (d) or the Purpose of the Act

As discussed above, we conclude that the language of section 1793.2, subdivision (d)(2) does not permit any reduction

---

977 F.Supp. 237; *Hibbs v. Jeep Corp.* (Mo.Ct.App. 1984) 666 S.W.2d 792; *Sanborn v. Aranosian* (1979) 119 N.H. 969.

in the restitution award by the amount of a trade-in credit or sale. Nonetheless, FCA's contention that restitution as detailed in section 1793.2 should have the same meaning as common law restitution is not unreasonable on its face. By recovering the full statutory restitution remedy after receiving value for the vehicle in the form of a trade-in credit, it can be argued that Niedermeier was placed in a better financial position than if she had not purchased the vehicle. To resolve any potential ambiguity, we consider the legislative history of sections 1793.2 and 1794 and the Act's purpose. (*Kirzhner*, *supra*, 9 Cal.5th at p. 972.) We conclude that even if the statute is amenable to more than one reasonable interpretation, additional indicia of legislative intent support our holding that at least where, as here, a consumer has been forced to trade in or sell their vehicle due to the manufacturer's failure to promptly pay restitution when its obligation arose, trade-in or sale proceeds do not reduce the statutory restitution remedy.

The Legislature adopted the Act in 1970 to address problems with enforcing consumer warranties for new products, including the problem of manufacturers reaping the advertising benefits of warranties without bearing the costs of promised repairs. (Stats. 1970, ch. 1333, § 1, p. 2478 et seq.) The original restitution remedy provided, "[s]hould the manufacturer be unable to make such return of merchantable goods, he shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to discovery of the defect." (Former § 1793.2, subd. (c), added by Stats. 1970, ch. 1333, § 1, p. 2481.)

In 1982, the Legislature amended the Act in several ways. It amended section 1793.2 to apply the "repair and replace"

provisions of the Act to "new motor vehicles" bought for personal use.[7] (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 123; Stats. 1982, ch. 388, § 1, pp. 1720–1723.) The Legislature also added section 1794 to the Act to help consumers and courts understand the panoply of remedies available to buyers under different laws for breach of a consumer warranty by enumerating each of the remedies in one statute. (*Gavaldon v. DaimlerChrysler Corp.* (2004) 32 Cal.4th 1246, 1261; see also Dept. Consumer Affairs, Explanation and Analysis of Assem. Bill No. 3560 (1981–1982 Reg. Sess.) Mar. 1982, p. 2 ["[t]he bill's purpose and function is to consolidate and restate in a single section of the . . . Act the remedies now available to buyers under the Song-Beverly Act and other California and federal laws"]; see also *ibid.* ["This bill is essentially a consumer law 'housekeeping' bill whose function is to make our consumer warranty law more coherent, rational, understandable and effective"].) As originally enacted, section 1794 provided in pertinent part that "[t]he measure of the buyer's damages in an action under this section shall be as follows: [¶] (1) Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale, Sections 2711, 2712, and 2713 of the Commercial Code shall apply. [¶] (2) Where the buyer has

---

[7]    As amended, section 1793.2, subdivision (d) provided, "Should the manufacturer or its representative in this state be unable to service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity." (Stats. 1982, ch. 388, § 1, p. 1721.)

accepted the goods, Sections 2714 and 2715 of the Commercial Code shall apply, and the measure of damages shall include the cost of repairs necessary to make the goods conform." (Former § 1794, subd. (b), added by Stats. 1982, ch. 385, § 2, p. 1716.) Although restitution and replacement were available remedies since the enactment of the Song-Beverly Act, they were not mentioned in the 1982 version of section 1794.

After these amendments to the lemon law, however, there were numerous complaints from new car buyers concerning its implementation, including that manufacturers were not paying full restitution or replacement awards and were seeking excessive offsets for rental cars. (See Dept. Consumer Affairs, Enrolled Bill Rep. on Assem. Bill No. 2057 (1987–1988 Reg. Sess.) Sept. 25, 1987, pp. 2–3; see also Assembly 3d reading analysis of Assem. Bill No. 2057 (1987–1988 Reg. Sess.) as amended June 11, 1987, at p. 4; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2057 (1987–1988 Reg. Sess.) as amended August 17, 1987, p. 3.)

As a result, the Legislature again amended the Act in order to protect consumers. Among other things, the Legislature amended section 1794 to clarify that a buyer's damages include the rights of replacement and reimbursement *and* the California Uniform Commercial Code's additional remedies, and amended section 1793.2, subdivision (d) to comprehensively explain how to calculate restitution. (See Legis. Counsel's Dig., Assem. Bill No. 2057 (1987–1988 Reg. Sess.) p. 2 ["This bill would revise the provisions relating to warranties on new motor vehicles to require the manufacturer or its representative to replace the vehicle or make restitution, *as specified*, if unable to conform the vehicle to the applicable express warranties after a reasonable number of attempts"

(italics added)]; see also Stats. 1987, ch. 1280, §§ 1, 2, 4; *id.*, § 9, p. 4567 [amendment to section 1794 "does not constitute a change in, but is declaratory of, existing law"].)

FCA argues the 1982 version of section 1794 demonstrates that the Legislature intended for damages under the Act to be reduced by ordinary damages principles laid out in the California Uniform Commercial Code. But there is no indication in the legislative history that the reference to California Uniform Commercial Code remedies in section 1794 was intended to supplant or limit the statutory restitution remedy. To the contrary, the history is clear that the statute was intended to *consolidate*, not add to or subtract from, the existing remedies for the enforcement of a consumer warranty. (Dept. Consumer Affairs, Explanation and Analysis of Assem. Bill No. 3560 (1981–1982 Reg. Sess.) Mar. 1982, pp. 1, 4.) Had the Legislature intended for the statutory restitution remedy to be limited by the California Uniform Commercial Code provisions referenced in section 1794, "it would not have chosen such an obscure mechanism to achieve its purpose." (*Murillo, supra,* 17 Cal.4th at p. 992.)

FCA also relies on legislative history addressing the 1970 version of section 1794 to argue that the Legislature intended to apply ordinary contract rules whenever a consumer cannot return a defective vehicle. All three documents FCA relies upon — a letter from a legislative aide to Senator Song addressing the meaning of some language in the Act and two letters from the Legislative Counsel to Senators Cologne and Song, respectively, expressing various opinions in response to particular questions relating to the Act — are postenactment documents and are entitled to little weight because they do not reflect the legislative body enacting the statute. (*Quintano v.*

*Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 [statements of an individual legislator, including bill author, are generally not considered in construing a statute; court's task is to ascertain the intent of the Legislature as a whole]; *Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 690, citing *Bruesewitz v. Wyeth LLC* (2011) 562 U.S. 223, 242 [" '[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation' because 'by definition [it] "could have had no effect on the [Legislature's] vote" ' "].) With respect to the letters from the Legislative Counsel, FCA focuses on two responses addressing distinguishable factual scenarios.  The first considers whether a manufacturer can refuse to replace, reimburse, or repair defective goods if (unlike here) the goods are not returned to be serviced at a service facility.  The second asks whether a privately-owned public utility has any liability under the Act if it sells consumer goods and contracts with an independent contractor for installation. The responses do not address, and therefore shed no light on, the specific issue that is before us in the present case.

The legislative history reveals little legislative analysis addressing the language of the current statutory restitution remedy, including the meaning of "the actual price paid or payable."  (See also *Mitchell, supra,* 80 Cal.App.4th at p. 39 [" 'interpretive commentary' on the statute's replacement or refund remedy is practically nonexistent"].)  Nevertheless, we can draw insight from the history of the amendments to sections 1793.2 and 1794.  This history demonstrates that the Legislature intended to lay out a precise method for calculating restitution awards payable to buyers, including the amounts allowed to be reduced from awards.

The evolution of the Act also indicates a legislative intent to ensure buyers receive full compensation under the Act, to make it easier for buyers to access all the benefits to which they are entitled under applicable warranties, and to constrain manufacturers from evading their statutory obligations.  To this end, since its enactment, the Act "has been amended numerous times to broaden its consumer protection policy, expand the classes of vehicles to which the lemon law applies, lessen the types of defenses that can [be] asserted, and change the statutory text in response to appellate decisions."  (Frank, *Lemon Law* (Nov. 2016) 39 L.A.Law. 27, 32.)  This counsels against reducing statutory restitution awards by trade-in credits or sales proceeds, when such reductions are not enumerated or authorized in section 1793.2, subdivision (d).  Any such reduction would be inconsistent with the legislative history and the Act's consumer protective purpose.

## C. The Act's Labeling and Notification Provisions Do Not Support an Offset to the Statutory Restitution Remedy for a Trade-in Credit or Sale Proceeds

FCA maintains that Niedermeier's interpretation of the statutory restitution remedy would undercut the labeling and notification provisions in sections 1793.22 and 1793.23 (hereafter sometimes referred to as the labeling and notification provisions).  It echoes the Court of Appeal's concerns that Niedermeier's interpretation "would incentivize buyers to reintroduce defective vehicles into the market without the warnings a manufacturer otherwise would have to provide" and "would render the labeling and notification provisions largely meaningless, a result contrary to the rules of statutory construction."  (*Niedermeier, supra,* 56 Cal.App.5th at p. 1072.)

In FCA's view, no rational owner would return their defective vehicle to the manufacturer if they could instead resell their vehicles to third parties.  The Court of Appeal similarly could not "conceive why a buyer would ever return a vehicle to the manufacturer rather than obtain the extra proceeds from a resale or trade.  Return of the vehicle to the manufacturer would be the rare exception rather than the rule." (*Ibid.*)  We disagree.

As FCA concedes, sections 1793.22 and 1793.23 require *manufacturers*, not consumers, to label defective vehicles as lemons once they are reacquired.   (§ 1793.22, subd. (f)(1) [manufacturers must provide a one-year warranty for all defective vehicles transferred to it under the Act]; § 1793.23, subds. (c)–(e).)   Buyers have neither the obligation nor the ability to label their defective vehicles lemons.  Had FCA promptly refunded Niedermeier when its obligation to do so arose, the defective vehicle could have been reacquired and labeled a lemon by the manufacturer.  Buyers like Niedermeier are only confronted with the possibility of selling or trading in their defective vehicles after manufacturers have failed to comply with their obligation to promptly replace or repurchase the vehicle.  When this occurs, buyers may have no choice but to engage in self-help to relieve themselves of the burden of owning or possessing a lemon.  Contrary to the Court of Appeal's focus, it is manufacturers, not buyers who are forced to trade in or sell their vehicles, who undercut the Act's labeling and notification provisions by failing to timely comply with the Act's requirements. (*Figueroa, supra*, 84 Cal.App.5th at pp. 713, 714; see also *Williams, supra,* 5 Cal.App.5th at pp. 784–785.) Allowing buyers to recover full restitution, as defined in the statute, incentivizes manufacturers to comply with their obligations under the Act.

Neither FCA nor the Court of Appeal provide any basis for their opinion that no rational owner would return their defective vehicle or that returning a defective vehicle would become the rare exception rather than the rule, and we question these assumptions. Niedermeier made three separate requests to return the vehicle after multiple attempts to repair it over four years failed. It was not until FCA repeatedly declined to buy back the vehicle that Niedermeier gave up, purchased a new vehicle, and traded in the defective one. Even if a buyer is entitled to recover the full statutory restitution remedy in an action under section 1794, it is reasonable to believe that, like Niedermeier, buyers will continue to attempt to return defective vehicles before filing suit in order to avoid the time and trouble of selling or trading them in to a third party and resorting to litigation. The concurrence disagrees, maintaining that "[i]f trade-in or resale always yielded the potential for double recovery, one would expect a good number of consumers to go that route." (Conc. opn. of Kruger, J., *post*, at p. 15.) But manufacturers can rather easily avoid a result in which buyers resell defective cars simply by promptly complying with their obligations under the Act. (See *Figueroa*, *supra*, 84 Cal.App.5th at p. 713 [any windfall to the plaintiff was the direct result of FCA's willful violation of the Act, and "[h]ad FCA fulfilled its duty under the [Act] to promptly replace or repurchase the truck, there would be no such windfall"]; see also *Williams*, *supra*, 88 Cal.App.5th at p. 714.)

FCA and the Court of Appeal also overlook the fact that a buyer's decision to trade in or sell a vehicle is made in real time. It would be quite risky for a buyer to choose to trade in or sell a defective vehicle to a third party before a manufacturer is able to comply with its statutory obligation to promptly repurchase

or replace the vehicle.  The Act requires a buyer to deliver the defective vehicle to the manufacturer's service and repair facility for the purpose of allowing the manufacturer a reasonable number of repair attempts.  (§ 1793.2, subds. (c), (d); § 1793.22, subd. (b); *Kirzhner*, *supra*, 9 Cal.5th at pp. 969, 971, 986; *Krotin*, *supra*, 38 Cal.App.4th at pp. 302–303 ["the Act does not *require* consumers to take any affirmative steps to secure relief for the failure of a manufacturer to service or repair a vehicle to conform to applicable warranties — other than, of course, permitting the manufacturer a reasonable opportunity to repair the vehicle"]; *Martinez*, *supra*, 193 Cal.App.4th at pp. 191, 193.)  Once the manufacturer is unable to repair the vehicle after a reasonable number of attempts, the manufacturer's obligation to promptly provide restitution to the buyer arises.  (§ 1793.2, subd. (d)(2); see also § 1794, subd. (b); see also *Kirzhner*, *supra*, 9 Cal.5th at p. 986.)  Thus, it is only where the manufacturer fails to "promptly" provide restitution that a buyer would be able to trade in or sell a defective vehicle while also obtaining restitution from the manufacturer.  If a buyer were to trade in or sell the vehicle before affording the manufacturer a reasonable number of opportunities to repair the vehicle, the buyer would not be able to obtain restitution or replacement remedies under the Act.[8]  (*Kirzhner*, *supra*, at

---

[8]    We are not faced with circumstances in which a manufacturer has violated the Act but has a good faith and reasonable belief that a statutory obligation to pay restitution does not exist.  Neither are we faced with a situation in which a buyer sells or trades in a vehicle before a manufacturer has the opportunity to comply with its obligation to promptly pay restitution.  We do not decide today how such facts might affect the damages calculation; in this case, a jury found FCA not only

pp. 969, 971, 986; *Krotin*, *supra*, at pp. 302–303.) In this way, the Act itself curbs the concern that buyers will not return defective vehicles to the manufacturer for service and labeling.

FCA also argues the labeling and notification provisions, "contemplate[] that, in exchange [for the full restitution remedy], the buyer will return the car to the manufacturer. This is made clear by Section 1793.23, which states in four different places that a defective vehicle is 'accepted for restitution' by the manufacturer." FCA instructs us to assume, however, that consumers who cannot return a vehicle are still entitled to statutory restitution under section 1793.2. Indeed, FCA does not challenge *Martinez*'s holding that a plaintiff does not need to "possess or own the vehicle at issue in order to obtain replacement or restitution pursuant to the Act." (*Martinez*, *supra*, 193 Cal.App.4th at p. 192.) Yet FCA reasons that in light of section 1793.23, in situations where a consumer cannot return the vehicle, any value the consumer received from a trade-in or sale of the vehicle must nonetheless reduce the consumer's restitution award.

The "accepted for restitution" language in the Act, however, is only present in the labeling and notification provisions. (§ 1793.23, subds. (c)–(e).) It is notably absent from both sections 1794 and 1793.2, subdivision (d)(2). The labeling and notification provisions identify what a manufacturer must do to comply with the Act when it reacquires a vehicle. The provisions impose no limits on the remedies identified, and concededly applicable, in sections 1794 and 1793.2, subdivision (d)(2). Accordingly, this language does not require

---

failed to promptly pay Niedermeier restitution, but FCA also willfully failed to comply with the Act.

a buyer's restitution award to be reduced if the buyer does not return their defective vehicle to the manufacturer.

Ultimately, the labeling and notification provisions "are inapplicable in the situation where, as here, the manufacturer elects not to reacquire the vehicle and the buyer is forced to seek legal intervention." (*Williams*, *supra*, 88 Cal.App.5th at p. 783.) These provisions do not require a buyer to return a defective vehicle in order to receive restitution under the Act; they merely place a duty on the manufacturer or dealer to notify subsequent transferees that the car was reacquired due to a nonconformity.[9] Once restitution is available to a plaintiff as a remedy, which FCA concedes is the case here, the measure of restitution is as described in section 1793.2, subdivision (d)(2), with no reductions other than those expressly stated in that subdivision.

## D. Additional Public Policy Considerations Support Not Reducing a Restitution Award by a Trade-in Credit or Sale Proceeds

There are a number of additional public policy reasons to conclude the statutory restitution remedy does not permit a reduction for a trade-in credit or sale proceeds.

---

[9]    The concurring opinion observes that the statutory restitution remedy seems to be built on the premise that a buyer returns the defective vehicle, the manufacturer accepts it, and the manufacturer offers the buyer their choice of a refund or replacement vehicle.  (See conc. opn. of Kruger, J., *post*, at p. 9.) But as FCA acknowledges, the question of whether *Martinez* was correctly decided is not before us, so we assume a buyer is not required to return the defective vehicle to a manufacturer to obtain restitution.

First, the Court of Appeal's (and FCA's) interpretation would incentivize manufacturers to drag out the process of offering restitution in hopes of paying reduced damages. Specifically, manufacturers would be encouraged to wait for consumers to become fed up with delays and give up and sell or trade in their defective (if not dangerous) vehicles, at which point the manufacturers could request that the consumers' damages be reduced accordingly. If the statutory restitution remedy can be reduced by a trade-in credit or sale proceeds, manufacturers will be relieved of the obligation to pay the full restitution amount required by statute. Such a rule would encourage "the manufacturer's unforthright approach and stonewalling of fundamental warranty problems." (*Krotin, supra,* 38 Cal.App.4th at p. 303.)[10]

Similarly, allowing a reduction to the statutory restitution remedy in actions pursuant to section 1794 would reward manufacturers for delaying refunds when the manufacturer "ha[s] complete control over the length of that delay, and an affirmative statutory duty to replace or refund promptly." (*Jiagbogu, supra,* 118 Cal.App.4th at p. 1244; *Williams, supra,*

---

[10]  Niedermeier and amicus Consumers for Auto Reliability and Safety argue that trade-in credits tend to be artificially inflated and are not reflective of the actual value of the vehicle. The prospect that a buyer would trade in a defective vehicle for an artificially inflated value would provide an even greater incentive for manufacturers to delay in repurchasing defective vehicles. However, Niedermeier's counsel advised the court as to the Yukon's purchase price; no evidence was introduced at trial as to the Yukon's purchase price or whether the trade-in amount reflected the vehicle's actual value. Thus, the court does not credit the assertion that the trade-in amount Niedermeier received was artificially inflated.

88 Cal.App.5th at p. 785 [manufacturer's interpretation "would, in essence, reward manufacturer for declining or not offering to reacquire the vehicle"].) If a manufacturer fails to comply with the Act, a buyer may spend months or years pursuing futile repair attempts and years in litigation pursuing remedies. Any delay in paying restitution increases the likelihood that a buyer will be forced to trade in or resell the defective vehicle or relinquish the vehicle to a lienholder, relieving manufacturers of the obligation to label the vehicles lemons.

FCA contends that reducing the restitution remedy by the amount of a trade-in credit or sale will not encourage delay. According to FCA, there is no economic difference from the manufacturer's perspective between a scenario in which a buyer returns the car to the manufacturer and the manufacturer is liable for the purchase price of the vehicle, and a scenario in which a buyer sells or trades in a car to a third party and the manufacturer pays the buyer reduced damages. This argument is not well taken. FCA ignores that manufacturers independently benefit from delays that cause buyers to trade in or sell defective vehicles because manufacturers are relieved of the burden of complying with the Act's labeling and notification requirements. Not only that, incidental damages cease accruing when buyers trade in or sell defective vehicles, further reducing the amount manufacturers have to pay in damages. FCA's interpretation would result in significant incentives for delay. Encouraging manufacturer delays would undermine the prompt restitution obligation imposed on manufacturers under the Act and contravene the Act's pro-consumer purpose. "Interpretations that would significantly vitiate a manufacturer's incentive to comply with the Act should be

avoided." (*Jiagbogu*, *supra*, 118 Cal.App.4th at p. 1244; see also *Kwan*, *supra*, 23 Cal.App.4th at p. 184.)

The Court of Appeal was unpersuaded by the argument that a buyer trading in a defective vehicle bears all or part of the cost of the manufacturer's delay, and observed that Niedermeier "can recover the full purchase price through a combination of the trade-in and restitution from defendant." (*Niedermeier*, *supra*, 56 Cal.App.5th at p. 1073.) The Court of Appeal fails to account for the fact that buyers are always forced to bear a burden when a manufacturer delays in promptly reimbursing or exchanging a vehicle. These burdens may include considerable stress and time diverted from work, school, family, or leisure activities while attempting to repair or return a defective vehicle. At a minimum, a manufacturer's failure to promptly reimburse a buyer imposes a financial burden on the buyer, who must continue to shoulder payments for a defective vehicle and — if the buyer can afford it — pay out of pocket for a new vehicle. This, by itself, is inconsistent with the pro-consumer purpose of the Act. If buyers cannot afford to buy a replacement vehicle, they may have no choice but to continue driving a defective or dangerous vehicle. Forcing consumers to engage in self-help in order to avoid the ongoing impact of a manufacturer's delay is not what the Legislature intended.

The Court of Appeal's interpretation of "actual price paid or payable" as not including trade-in or sale amounts could also compel buyers to choose replacement over restitution. Faced with the choice of a manufacturer delaying payment of restitution on the one hand, and a replacement option that requires a manufacturer to provide an alternate vehicle that is likely already available on the other hand, buyers may ultimately select replacement. This, however, would be in direct

contravention of the Act's explicit directive that "the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle." (§ 1793.2, subd. (d)(2).)

FCA argues that manufacturers have "ample incentive" to promptly comply with the Act because they are already subject to attorney fee awards and civil penalties for willful violations of the Act. The facts of this case prove otherwise. Niedermeier took the vehicle in for repair a total of 16 times over four years, rendering the vehicle out of commission for 75 days without it ever being repaired. Niedermeier made three separate demands for restitution — which she was not required to do under the Act (see *Krotin, supra*, 38 Cal.App.4th at pp. 302–303) — but FCA declined to repurchase the vehicle. Attorney fees and penalties were a real possibility in this case, and in fact were imposed on FCA for willfully violating the Act, but FCA still failed to promptly comply with the Act. As Niedermeier points out, "the most defective vehicles . . . are the vehicles most likely to be traded-in for a safe vehicle, yet those are the ones by which a manufacturer would reap the best benefit for its delay." To the extent FCA contends that manufacturers already have sufficient incentives to comply with the Act or that buyers will receive windfalls if the statutory restitution remedy is not reduced by the trade-in credit or sale proceeds, these are competing policy concerns that are more appropriately directed to the Legislature. (See *Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 696 ["The proper balancing of these competing priorities is ultimately and unquestionably 'a policy issue that lies within the province of the legislative, rather than the judicial, branch' "].)

For these reasons, we decline to adopt a rule that reduces a buyer's statutory restitution award by a trade-in credit or sale proceeds at least where, as here, a consumer has been forced to trade in or sell the defective vehicle due to the manufacturer's failure to comply with the Act. Once restitution is available to a plaintiff as a remedy, the measure of restitution is as described in section 1793.2, subdivision (d)(2), with no reductions other than those expressly stated in that subdivision. Our interpretation is supported by the plain language of the Act, the legislative history, and the consumer-protective purpose of the Act. It is also "more consistent with the rule that courts should liberally construe remedial statutes in favor of their protective purpose . . . ." (*Pineda, supra,* 51 Cal.4th at p. 532.)

The concurrence maintains a rule that categorically entitles consumers to obtain the full statutory restitution remedy without a reduction for trade-in or sale proceeds "would raise significant questions of fairness." (Conc. opn. of Kruger, J., *post*, at p. 15.)[11] To be sure, we do not mean to suggest that

_____

[11]     The concurrence also argues that such a rule "would mean that plaintiffs who buy luxury vehicles could wind up turning a substantial profit if those vehicles later prove defective, while plaintiffs who buy economy cars probably could not — for reasons that have nothing to do with the extent of their actual losses or the extent of the manufacturer's wrongdoing." (Conc. opn. of Kruger, J., *post*, at p. 15.) Consumers who purchase more expensive vehicles pay more as a matter of course for their vehicles and thus are more likely to obtain more when they are traded in or resold. The court does not assume, based on our holding, that consumers will start buying vehicles with the expectation that they will be defective and that manufacturers will refuse to comply with the Act, so that they can sell or trade

a consumer has the *right* to sell or trade in a vehicle at any time. Our holding is narrower and applies to the measure of restitution described in section 1793.2, subdivision (d)(2), in actions brought pursuant to section 1794. A consumer still has the obligation to permit manufacturers a reasonable opportunity to repair the vehicle. Manufacturers must also comply with their obligations under the Act, including the obligation to promptly repurchase or replace vehicles and the obligation to label vehicles lemons. Prompt compliance with the Act will ensure manufacturers meet these obligations and that defective vehicles end up in their possession for labeling.

## III.  DISPOSITION

As we conclude that neither a trade-in credit nor sale proceeds reduce the statutory restitution remedy, at least where a consumer has been forced to trade in or sell a defective vehicle due to the manufacturer's failure to comply with the Act, we do not reach the issue of whether the amount a buyer recovers should be assessed before or after calculating penalties. We reverse the judgment of the Court of Appeal.

EVANS, J.

We Concur:

GUERRERO, C. J.
CORRIGAN, J.
LIU, J.
GROBAN, J.
JENKINS, J.

---

in the vehicles and bring actions under the Act hoping to realize a profit.

NIEDERMEIER v. FCA US LLC

S266034

Concurring Opinion by Justice Kruger

Car manufacturer FCA US LLC willfully violated its duties under California's lemon law when it repeatedly refused to accept the return of Lisa Niedermeier's defective Jeep for replacement or a refund of the $40,000 she paid for it. Niedermeier eventually gave up on FCA and went to an unaffiliated dealership, where she traded in the defective Jeep for a working vehicle. Niedermeier sued FCA for her damages, including a full $40,000 refund. FCA now argues that because Niedermeier did not return the Jeep but instead traded it in for another car, FCA is entitled to subtract from her damages the likely inflated $19,000 trade-in credit she received for the Jeep. Never mind that the reason Niedermeier did not return the defective Jeep to FCA is that FCA had refused to accept it and promptly pay restitution, in willful violation of California's lemon law.

FCA's argument is all but self-refuting, and the court rightly rejects it. The majority opinion holds that under California's lemon law, a car buyer is entitled to a full refund for a defective vehicle even if the buyer has in the meantime traded it in or sold it to a third party — with the qualification that this rule applies "at least" where, as in this case, the buyer "has been forced" to trade in or sell the defective vehicle because of "the manufacturer's failure to comply with the [Song-Beverly Consumer Warranty] Act." (Maj. opn., *ante*, at p. 3.) I write

1

separately to explain how I understand this holding, including both the rule and the suggestion that the rule may have limits. I also write to explain why, in my view, such limits are important to a full understanding of the lemon law in light of its overarching consumer-protection purposes.

As I read the law, if a car proves defective, the buyer ordinarily must return the car to the manufacturer in order to receive a replacement vehicle or refund. The car manufacturer may then resell the returned car, but first must disclose to prospective buyers that the car has been designated a lemon. This usual order of operations ensures that original buyers are appropriately compensated when their cars cannot be made to conform to their warranties within a reasonable time, while also protecting prospective buyers from inadvertently purchasing vehicles that have a history of serious defects. But all bets are necessarily off if the manufacturer willfully thwarts the buyer's efforts to return the vehicle for a replacement or refund, which is what happened here. If the car buyer then engages in reasonable self-help by selling the car or trading it in for another vehicle, the manufacturer is not entitled to pocket the proceeds and thereby profit from its willful misconduct.

## I.

California's lemon law, formally known as the Song-Beverly Consumer Warranty Act (the Act), Civil Code section 1790 et seq., is a consumer protection law aimed specifically at new car buyers, who often depend on those cars to get to work, to take their children to school, and to handle myriad other daily necessities of life. Among other things, the law places affirmative obligations on car manufacturers to back up the

warranty promises made in connection with the sale of their products.

The dispute in this case centers on the meaning of various provisions of the lemon law addressing what happens when a car manufacturer is unable to make a car conform to its warranty after a reasonable number of attempts. One set of provisions concerns a buyer's remedies. The first of these provisions, Civil Code section 1793.2, subdivision (d)(2) (section 1793.2(d)(2)), provides that if the manufacturer has had a reasonable amount of time to repair the vehicle and still cannot get it done, the manufacturer has an obligation to "promptly" replace the defective vehicle or "make restitution" by refunding the buyer. (See *Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 971.) Appellate case law makes clear that this replace-or-refund obligation exists whether or not the buyer asks; it is the manufacturer's "affirmative duty to replace a vehicle or make restitution to the buyer if the manufacturer is unable to repair the new vehicle after a reasonable number of repair attempts." (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 303.)

This process is meant to work without court involvement. But if a manufacturer does not comply with its obligation to promptly repurchase or replace the defective vehicle, the buyer may turn to a second provision of the law, Civil Code section 1794 (section 1794), which creates "an action for the recovery of damages and other legal and equitable relief." (§ 1794, subd. (a).) A successful claimant in a suit under section 1794 is entitled to reasonable attorney's fees and costs (*id.*, subds. (d), (e)(1)), as well as damages whose measure "shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2, and" provisions of the

California Uniform Commercial Code governing the damages ordinarily available to a buyer of nonconforming commercial goods. (*Id.*, subd. (b).)

The law also provides for penalties to punish and deter willful violations. Appellate case law treats the manufacturer's violation as not willful "if [its] failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present. This might be the case, for example, if the manufacturer reasonably believed the product *did* conform to the warranty, or a reasonable number of repair attempts had not been made, or the buyer desired further repair rather than replacement or refund." (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 185.) If, however, a manufacturer violates the statute without such a good faith and reasonable belief, the judgment may include a civil penalty of up to two times the amount of actual damages. (§ 1794, subd. (c).)

That is the set of provisions governing the remedies available to the buyer of a defective car, and which forms the centerpiece of the dispute before us. There is also, however, a second set of provisions relevant to our inquiry, which are the provisions governing what's supposed to happen to the car after it is found to be defective. A car that has once been labeled a lemon because it could not be made to conform to its warranty within a reasonable time is not necessarily worthless, and it may be resold. But to prevent reselling defective or once-defective vehicles "without notice to the subsequent purchaser" (Civ. Code, § 1793.23, subd. (a)(2)), the law imposes various labeling and notification requirements on the manufacturer that has "reacquired" a vehicle that is "required by law to be replaced" or "accepted for restitution" under section 1793.2(d)(2)

or under comparable laws in other jurisdictions (Civ. Code, § 1793.23, subd. (c); see also *id.*, subds. (d)–(f)).

Specifically, before the manufacturer resells, leases, or transfers the car, the manufacturer must instruct the Department of Motor Vehicles to "inscribe the ownership certificate with the notation 'Lemon Law Buyback,' " and "affix a decal to the vehicle" indicating that it has been designated a " 'Lemon Law Buyback.' " (Civ. Code, § 1793.23, subd. (c); Veh. Code, § 11713.12, subd. (a).) The manufacturer must also provide written notice to the transferee of the nonconformities reported by the original buyer or lessee and of any repairs attempted to correct the nonconformity. (Civ. Code, §§ 1793.23, subd. (d), 1793.24, subd. (a)(3)–(4).) The Act likewise prohibits the sale, lease, or transfer of a vehicle "transferred by a buyer or lessee to a manufacturer pursuant to [section 1793.2(d)(2)] or a similar statute of any other state" absent disclosure of the vehicle's nonconformities, correction of those nonconformities, and a one-year manufacturer warranty that the vehicle is free of the nonconformities. (*Id.*, § 1793.22, subd. (f)(1); see generally *Niedermeier v. FCA US LLC* (2020) 56 Cal.App.5th 1052, 1065–1066.)

## II.

The threshold question in this case is whether the plain language of the statute forecloses FCA's argument for calculating Niedermeier's damages by subtracting the trade-in value of the Jeep from the original purchase price. The plain-language argument goes something like this: Section 1794 says that a car manufacturer that violates its lemon law duties must pay damages including "replacement or reimbursement as set forth in subdivision (d) of Section 1793.2." (§ 1794, subd. (b).)

And the restitutionary remedies in section 1793.2(d)(2) specify precisely what this means. A manufacturer required to reimburse the buyer for a defective car must pay the actual price of the vehicle but may make reductions for nonmanufacturer items installed by a dealer or the buyer, and the amount directly attributable to the vehicle's use by the buyer before first delivering it for correction of the warranty nonconformity. (§ 1793.2(d)(2)(B), (C).) But those provisions do not say anything about reducing the reimbursement amount by the trade-in or resale value a buyer receives for the defective vehicle. By negative implication, then, a manufacturer may not reduce the reimbursement amount by whatever proceeds the buyer may have received through selling or trading in the car to a third party.

The majority walks through this argument (maj. opn., *ante*, at pp. 10–23), but it also, in the end, acknowledges that a "potential ambiguity" in the statutory language makes it appropriate to consider legislative history and the purposes and policies underlying the lemon law in arriving at the conclusions the court reaches today (*id.* at p. 24). I emphatically agree the statute is ambiguous.

Looking at sections 1793.2(d)(2) and 1794 in isolation, the idea that the plain language of the provisions answers the question has some superficial appeal. The difficulty with the plain-language argument, however, is that it would seem to prove too much. The restitutionary remedy in section 1793.2(d)(2) is not specific to cases like this one, in which a car manufacturer has willfully violated its duties to make a prompt offer of replacement or refund. Indeed, section 1793.2(d)(2) does not address *violations* of those duties at all; it is what tells car manufacturers what they must do in the first instance to *avoid*

violating their duties.  By suggesting that section 1793.2(d)(2) categorically entitles a car buyer to trade in or sell a defective vehicle to a third party, retain the proceeds, and still demand a full refund of the purchase price (or even a brand-new replacement vehicle from the manufacturer), the plain-language argument would seem to provide an avenue for double recovery in every lemon law case, regardless of whether the manufacturer has done anything wrong.  This is not the only way — or even a particularly likely way — to understand the text of the relevant remedial provisions.[1]

One reason is the one the majority expressly identifies: Allowing across-the-board double recovery for lemon law plaintiffs arguably overshoots what the Legislature was aiming at when it provided for damages to include a right of "restitution," even if that right is statutory rather than based in common law.  (Maj. opn., *ante*, at p. 24; see *Alder v. Drudis*

---

[1]  The court in *Martinez v. Kia Motors America, Inc.* (2011) 193 Cal.App.4th 187, 194, did appear to adopt this reading of the language of the statute.  But the actual holding of the case did not depend on it.  In *Martinez*, the buyer abandoned her nonfunctioning car at the dealership after the dealer refused to provide warranty coverage to repair it.  The car was ultimately repossessed.  (*Id*. at p. 192.)  There was no trade-in or resale to contend with, no dispute about the proper amount of restitution, and no question about the calculation of damages. The Court of Appeal determined that nothing in the lemon law required Martinez to possess the vehicle before pursuing damages for the violations she asserted.  (*Id*. at pp. 193–194.)  Whether and to what extent the *Martinez* opinion correctly reasoned through the issue before it is beyond the scope of our inquiry in this case. It suffices to observe that the actual holding of *Martinez* is not inconsistent with a more nuanced understanding of the statute that acknowledges its ambiguities.

(1947) 30 Cal.2d 372, 384 ["[t]he purpose of restitution as a remedy for [contract] breach is the restoration of the *status quo ante* as far as is practicable"].)

But the more fundamental reason, as I see it, relates to the relationship between section 1793.2(d)(2) and related provisions governing what is supposed to happen to a car after it has proved defective. If the statute does not specify that resale or trade-in values are to be excluded from the "restitution" for which section 1793.2(d)(2) provides, that may simply be because the statute does not anticipate the scenario in which a car buyer seeks a full refund or replacement vehicle despite having sold the defective car to a third party.

Again, recall that section 1793.2(d)(2) is not written as a remedy for manufacturer wrongdoing; it is, rather, the provision that tells the manufacturer what it must do when a defective car doesn't live up to the warranty. The assumption running through the statute appears to be that, in the ordinary course, if it appears that a car cannot be made to conform to the warranty within a reasonable number of repair attempts, the manufacturer will offer replacement or restitution and will reacquire the car in exchange.

This assumption is most clearly evident in the Act's labeling and notification provisions governing "Lemon Law Buyback" (Civ. Code, § 1793.23), which impose on manufacturers multiple requirements designed to disclose a defective vehicle's past before the vehicle can be sold to another buyer. These provisions expressly refer to cars "accepted for restitution" under section 1793.2(d)(2) — suggesting that the cars will, in fact, be returned to the manufacturer in exchange for the restitution described in that section. (Civ. Code,

§ 1793.23, subds. (c)–(e).) And, perhaps more fundamentally, the labeling and notification provisions can serve their essential purpose of protecting downstream consumers in the used-car market only if the manufacturers have the chance to comply, which means the cars must somehow find their way back into the manufacturers' hands.

None of this is, or should be, especially controversial. Indeed, Niedermeier's counsel acknowledged at oral argument that the idea that a car buyer will return the defective vehicle in exchange for replacement or full refund is "embedded" in the statutory framework that describes what is supposed to transpire when a manufacturer cannot conform a vehicle to its warranty, even if the lemon law may not say so in explicit terms. The restitutionary remedy in section 1793.2(d)(2) appears built on this premise: The buyer returns the defective vehicle, the manufacturer accepts it and in return offers the buyer her choice of a refund or a replacement vehicle.[2]

---

[2] Unsurprisingly, many other states' lemon laws make the return of the car an explicit requirement. (E.g., N.J. Stat. Ann. § 56:12-32(a)(1) ["the manufacturer . . . shall *accept return* of the motor vehicle from the consumer" and "(1) . . . provide the consumer with a full refund of the purchase price of the original motor vehicle" (italics added)]; N.Y. Gen. Bus. Law § 198-a(c)(1) ["the manufacturer, at the option of the consumer, shall replace the motor vehicle with a comparable motor vehicle, or *accept return* of the vehicle from the consumer and refund to the consumer the full purchase price" (italics added)]; R.I. Gen. Laws § 31-5.2-3(a)(1) ["the manufacturer shall *accept return* of the vehicle from the consumer or lessee and, at the consumer's or lessee's option, refund the full contract price or lease price of the vehicle including all credits and allowances for any trade-in vehicle" (italics added)]; Wn. Rev. Code Ann. § 19.118.041(1)

The problem we confront here raises a set of issues as to which the statute provides no express instruction. What happens if the buyer doesn't return the vehicle — because, as occurred here, the manufacturer refuses to take the car back — and the buyer then trades it in or sells it to a third party? Is the buyer entitled to a full refund or replacement? The statute offers no clear answers.

To navigate this hazy area of the lemon law, we can look, as the majority says, to the legislative history and, ultimately, to the law's purposes as they relate to the issue before us. (Maj. opn., *ante*, at p. 24.) As I understand the majority opinion, the dispositive consideration is an essentially equitable one that focuses on the circumstances of this case and others like it. If Niedermeier did not return the defective Jeep, it was not for lack of trying. It was, rather, because FCA willfully refused to accept the return of the Jeep and promptly pay restitution, as it was statutorily required to do. If the result was that Niedermeier ultimately sold the Jeep in a manner that undercut the labeling and notification requirements, the fault belongs with FCA, which effectively forced Niedermeier into that position. FCA should not then be permitted to profit from its intransigence by subtracting the likely inflated trade-in credit Niedermeier received from the total amount it would otherwise owe Niedermeier in damages. (Maj. opn., *ante*, at pp. 30–31, 35–38.)

---

["the manufacturer . . . shall, at the option of the consumer, replace or *repurchase* the new motor vehicle" (italics added)]; see also *Martinez v. Kia Motors America, Inc.*, *supra*, 193 Cal.App.4th at pp. 196–197 [discussing additional jurisdictions that require return of a defective vehicle for a lemon law refund].)

This is not a particularly novel concept, nor one unique to the lemon law. It is, rather, essentially a statute-specific application of the well-established equitable principle that "[n]o one can take advantage of his own wrong." (Civ. Code, § 3517.) The problem raised by the calculation of the "restitution" owed to Niedermeier in this case, in other words, evokes the familiar doctrine of unjust enrichment. The doctrine is "based on the idea that 'one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made.'" (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 542.) "Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the defendant to restore the plaintiff to his or her original position. [Citations.] The principle of unjust enrichment, however, is broader than mere 'restoration' of what the plaintiff lost." (*Ibid.*) "The emphasis is on the wrongdoer's enrichment, not the victim's loss. In particular, a person acting in conscious disregard of the rights of another should be required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again." (*Ibid.*; see *Ward v. Taggart* (1959) 51 Cal.2d 736, 741–742; Rest.3d Restitution and Unjust Enrichment, § 1.)

Consideration of unjust enrichment principles offers an explanation for the conclusion that a manufacturer obligated to pay lemon law damages may not withhold the amounts it would otherwise save through its willful violation of section 1793.2(d)(2) — which is to say, its "conscious disregard" of the buyer's statutory rights and of its own statutory duties. (*County*

*of San Bernardino v. Walsh, supra*, 158 Cal.App.4th at p. 542; see Rest.3d Restitution and Unjust Enrichment, *supra*, § 51, subd. (4) ["unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong"]; *American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1487 [same].) Through its misconduct — unjustly refusing to accept Niedermeier's Jeep for restitution even after multiple repair efforts had failed to make the Jeep safe to drive — FCA effectively "forced" Niedermeier to trade in her Jeep for a working vehicle (maj. opn., *ante*, at pp. 3, 24, 39, 40), and improperly retained the full restitution to which she was entitled under section 1793.2(d)(2). Considered in light of unjust enrichment principles, the damages calculation prescribed by sections 1794 and 1793.2(d)(2) cannot be interpreted to reward FCA for this willful wrongdoing.

The trial court in this case invoked these principles when it rejected FCA's request for a reduction in damages, expressly citing the tenet that " '[n]o one can take advantage of his own wrong.' " And in other cases — also, as it happens, against FCA — courts have rejected similar requests for a reduction in damages with the observation that FCA should not "be compensated for its own willful violation of the law." (*Figueroa v. FCA US, LLC* (2022) 84 Cal.App.5th 708, 713; see also *Williams v. FCA US LLC* (2023) 88 Cal.App.5th 765, 785 [agreeing with *Figueroa* and declining to interpret the Act to "reward manufacturer" for its willful refusal to reacquire the vehicle].) Regardless of whether Niedermeier would otherwise be entitled to trade in her Jeep and pocket the proceeds, any reasonable understanding of the lemon law refutes the idea that FCA is entitled to profit from the course of action that led Niedermeier to that point in this case.

Niedermeier invoked the requirements of the Act by presenting her Jeep to FCA for repair; she also specifically asked FCA to accept the Jeep for restitution when many repairs over an extended period did not conform the Jeep to its warranty. Niedermeier, in other words, *tried* to return her vehicle to FCA, as the Act envisions, and would have been entitled to recover full restitution as described in section 1793.2(d)(2) if FCA had not willfully violated the Act and refused her return. Under these circumstances, Niedermeier's "rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2" (§ 1794, subd. (b)), for purposes of measuring her damages, include the full measure of restitution to which she would have been entitled absent FCA's willful violation of its duties and conscious disregard of her rights.

### III.

The majority opinion suggests — but does not outright hold — that the result might be different in a different case. It says that the statute entitles a plaintiff car buyer to a full refund, without any deductions for trade-in or resale value, but adds this qualification: "at least where, as here, a consumer has been forced to trade in or sell a defective vehicle due to the manufacturer's failure to comply with the Act." (Maj. opn., *ante*, at p. 3.) The majority also makes clear that its holding is limited to circumstances like those presented in this case, and is leaving open whether the same rule would apply in a case involving a good-faith, reasonable mistake about whether the Act's replace-or-refund provision applies to a particular vehicle. (*Id.* at pp. 32–33, fn. 8.)

In my view, the result the court reaches today makes sense precisely because of the circumstances we confront. Although

the majority opinion leaves the limits of its holding for exploration in a future case, those limits are, in my view, important to a full understanding of the law.

There is no real question that a rule the majority applies today results in something of a windfall for the buyer, in that it leaves her better off than she was before she purchased the defective car. (Accord, maj. opn., *ante*, at p. 24.) In a case where she has been forced to sell the car because of the manufacturer's willful failure to promptly refund or replace the car in accordance with the law, none of this matters. The reason the buyer in Niedermeier's position is entitled to a full refund is not because all the money is necessary to make her whole; it is, rather, because it is necessary for the manufacturer to relinquish any claim on the money, in order to avoid rewarding misbehavior and to avoid encouraging a repeat of the same statute-defying stunt in future cases. (Cf., e.g., *Center for Healthcare Education & Research, Inc. v. International Congress for Joint Reconstruction, Inc.* (2020) 57 Cal.App.5th 1108, 1129 [the " 'profit-based measure of unjust enrichment determines recoveries against conscious wrongdoers' " and " 'may potentially exceed any loss to the claimant' "].)[3]

---

[3] I do not mean to overstate the degree to which our holding is likely to affect manufacturers' existing incentives to do their best to comply with the law. As the majority points out, the prospect of hundreds of thousands of dollars in civil penalties and attorney fees was not enough to deter FCA's misbehavior in this case. (See maj. opn., *ante*, at p. 38.) It is unclear to me, at least, that the prospect of being denied a $19,000 trade-in credit would have made a dispositive difference. But the point here is not how effective any individual component of the monetary remedy may be in deterring wrongdoing in any particular case.

But it is not hard to see why the Court of Appeal in this case was concerned about adopting a rule that would extend similar treatment across the board, to any buyer of a defective vehicle who might choose to trade in or sell the vehicle for profit rather than give it back to the manufacturer. Certainly some buyers might choose continued repairs rather than getting rid of the vehicle and "resorting to litigation." (Maj. opn., *ante*, at p. 31; see also *Kwan v. Mercedes-Benz of North America, Inc.*, *supra*, 23 Cal.App.4th at p. 186 [the plaintiff "repeatedly agreed to allow continued repair efforts rather than insisting on replacement or refund"].) But a rule that guaranteed full reimbursement on top of trade-in or resale profit would almost certainly alter some consumers' calculations. If trade-in or resale always yielded the potential for double recovery, one would expect a good number of consumers to go that route. And as the Court of Appeal explained, the result would be to undermine the operation of the labeling and notification provisions, which depend on buyers returning their defective cars to manufacturers rather than selling their unlabeled lemons into the used-car market. (*Niedermeier v. FCA US LLC*, *supra*, 56 Cal.App.5th at pp. 1071–1072.)

An across-the-board rule giving lemon law plaintiffs a categorical entitlement to full reimbursement (or else a new replacement car) plus the proceeds of resale or trade-in would also raise significant questions of fairness. A rule permitting this sort of double recovery in every case would mean that plaintiffs who buy luxury vehicles could wind up turning a substantial profit if those vehicles later prove defective, while

The point is that such wrongdoing should not be rewarded in any measure.

plaintiffs who buy economy cars probably could not — for reasons that have nothing to do with the extent of their actual losses or the extent of the manufacturer's wrongdoing.  It is unclear why the Legislature would have set up a remedial scheme that would authorize this additional recovery based solely on the price tag of the car, and thus, by extension, the financial means of the buyer.

By applying its holding "at least" in a case involving circumstances like those before us — that is, a willful failure to accept the return of a defective vehicle and make restitution — the majority leaves open the possibility that the rule it announces may be limited to such cases, and does not necessarily apply across the board.  As I see it, such a limit is not only sound, but important to a complete understanding of the statutory scheme.  On that understanding, I concur in the majority's reversal of the judgment of the Court of Appeal.


**KRUGER, J.**


**We Concur:**

**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Niedermeier v. FCA US LLC

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 56 Cal.App.5th 1052
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S266034
**Date Filed:** March 4, 2024

---

**Court:** Superior
**County:** Los Angeles
**Judge:** Daniel S. Murphy

---

**Counsel:**

Gibson, Dunn & Crutcher, Thomas H. Dupree, Jr., Matt Gregory, Shaun Mathur; Clark Hill and David L. Brandon for Defendant and Appellant.

Knight Law Group, Steve Mikhov, Roger Kirnos, Amy Morse; Hackler Daghighian Martino & Novak, Sepehr Daghighian, Erik K. Schmitt; Greines, Martin, Stein & Richland, Cynthia E. Tobisman, Joseph V. Bui; Public Justice and Leslie A. Brueckner for Plaintiff and Respondent.

Consumer Law Practice and Daniel T. LeBel for Consumers for Auto Reliability and Safety as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas H. Dupree, Jr.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8547

Cynthia E. Tobisman
Greines, Martin, Stein & Richland LLP
6420 Wilshire Boulevard, Suite 1100
Los Angeles, CA 90048
(310) 859-7811